

Villanova University School of Law

Villanova University School of Law Digital Repository

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-22-2004

# Intl Union v. Secretary of Labor

Precedential or Non-Precedential: Precedential

Docket No. 03-4146

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Intl Union v. Secretary of Labor" (2004). *2004 Decisions.* Paper 883.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/883

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

(Opinion Filed:  March 22, 2004)

No. 03-4146

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW;
UNITED STEELWORKERS OF
AMERICA,

Petitioners

v.

ELAINE CHAO, SECRETARY OF
LABOR; OCCUPATIONAL SAFETY
AND HEALTH ADMINISTRATION,

Respondents

PETITION FOR REVIEW OF AN
ORDER OF THE
SECRETARY OF LABOR

Argued:  January 9, 2004

Before: BARRY, SMITH, Circuit
Judges, and POLLAK,[*] District Judge

---

[*] The Honorable Louis H. Pollak,
(continued...)

Randy S. Rabinowitz, Esq. (Argued)
5512 Carolina Place, N.W.
Washington, DC   20016
-AND-
Daniel Sherrick, Esq.
Catherine Traffton, Esq.
International Union, UAW
8000 East Jefferson
Detroit, Michigan 48214
-AND-
Paul Whitehead, Esq.
David Goldman, Esq.
United Steelworkers of America
5 Gateway Center
Pittsburgh, PA  15222

Attorneys for Petitioners

Howard M. Radzely, Esq.
Solicitor of Labor
Joseph M. Woodward, Esq.
Associate  Solicitor  for  Occupational
Safety and Health

---

[*](...continued)
District Judge, United States District
Court for the Eastern District of
Pennsylvania, sitting by designation.

Ann Rosenthal, Esq. (Argued)
Bruce Justh, Esq.
Charles F. James, Esq.
Joanna Hull, Esq.
United States Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Washington, DC   20210

Attorneys for Respondents

Douglas R. Cox, Esq.
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W.
9th Floor
Washington, D.C. 20036

Attorney for Amicus Chamber of
Commerce US and  Natl Assn Mfg

Jeffrey L. Leiter, Esq.
6718 Whittier Avenue
Suite 200
McLean, VA 22101

Attorney for Amicus Precision
Precision Machine, National Tooling
and Ind Lubricant Mfg

---

OPINION OF THE COURT

---

BARRY, Circuit Judge

On December 9, 1993, the International Union of United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW") petitioned the Occupational Safety and Health Administration ("OSHA") to take "immediate action to protect workers from the health effects of occupational exposure to machining fluids[.]"   UAW urged OSHA to promulgate a rule that would establish a standard for occupational exposure to machining, or metalworking, fluids ("MWFs").  OSHA did not formally respond to UAW's petition for rulemaking until more than a decade later when, by letter dated December 16, 2003, John Henshaw, Assistant Secretary of Labor for Occupational Safety and Health, denied UAW's petition.

The December 16th response was submitted together with a brief to this Court, for on October 21, 2003, understandably impatient with the delay, UAW, now joined by the United Steelworkers of America, petitioned this Court, pursuant to section 6(f) of the Occupational Safety & Health Act of 1970, 29 U.S.C. § 655(f) (OSH Act), to review what they described as the "unreasonable delay" of respondents OSHA and the Secretary of Labor in issuing the requested standard under section 6(b)(5) of the OSH Act. The Administrative Procedure Act ("APA"), together with the OSH Act, permit a petition to the federal courts of appeals to review federal agency action (or inaction). 5 U.S.C. § 706; 29 U.S.C. § 655(f). We, thus, have jurisdiction over the petition before us which the parties, and the Court, agree is appropriately recharacterized as a petition to review final agency action. *See In re International Chemical Workers*

2

*Union*, 830 F.2d 369, 370 (D.C. Cir. 1987) (when a petition to compel rulemaking was pending and the agency denied rulemaking, it was appropriate to treat the pending petition as a petition for review of the denial).

For the reasons that follow, we find that the Secretary's denial of the request for rulemaking proceedings on MWFs was neither arbitrary nor capricious. We, therefore, will deny the petition for review.

## I. Background

Metalworking fluids are used in a wide variety of industries as coolants and lubricants for metal machining, grinding, cutting, forming, tooling, and treating in manufacturing operations. Approximately 1.2 million workers (including, among others, machinists, mechanics, and metalworkers), who are employed at approximately 185,000 establishments, are exposed to MWFs by means of skin contact or by breathing or otherwise ingesting particles from mists or aerosols.

There is little doubt, and it is not disputed here, that exposure to MWFs can have debilitating health effects. The nature and prevalence of health effects from MWF exposure is, however, hotly disputed. Asthma, hypersensitivity pneumonitis ("HP"), other respiratory diseases, and cancer are among the effects or potential effects that UAW claims result from MWF exposure. While there is little debate about the link between MWF exposure and respiratory disorders and dermatitis (again, the debate is over the severity and prevalence), the evidence supporting a connection to cancer is equivocal.

Initially, OSHA responded in December 1995, albeit informally, to UAW's 1993 petition when it designated MWFs as a regulatory priority. In 1997, OSHA empaneled a Metalworking Fluids Standards Advisory Committee ("MWFSAC" or "Committee"). The Committee of 15 members had five labor representatives, five industry representatives, and five public representatives. On July 15, 1999, the Committee issued its final report and recommendations.

The Committee unanimously recommended that OSHA take action to limit worker exposure to MWFs. The recommendation was based upon the "demonstrated health effects" of exposure to MWFs: dermatitis, asthma, HP, and other respiratory disorders. The Committee members, however, did not agree on the best way to limit worker exposure to MWFs. A majority of the Committee recommended that OSHA promulgate a rule, while a minority thought that non-mandatory guidelines and educational programs would better address the problem. A majority of the Committee also concluded that exposure to old formulations of MWFs caused skin cancer and cancer at other sites. Only a minority of the Committee, however, concluded that there was adequate evidence to link exposure of current formulations of MWFs

to skin cancer or cancer at other sites. In sum, the Committee unanimously recognized a link between MWF exposure and non-malignant illnesses (i.e., dermatitis, respiratory disorders, HP, and asthma) and, based upon this recognition, a majority recommended promulgation of a rule. The Committee's recommended course of action was not premised on a connection between MWFs and cancer.

Beginning in 1999, and seemingly in response to the Committee's recommendation, OSHA began to include MWFs in its published Regulatory Agenda. MWFs were identified as a "Long Term Action" item, meaning that the issuance of a standard was anticipated in a year's time. By 2001, however, no standard had been issued, and OSHA removed MWFs from its Regulatory Agenda, publishing, instead, a MWF Best Practices Guide. The Guide is non-binding and unenforceable.

In October 2003, UAW filed the petition for review now before us, asserting that the Secretary of Labor and OSHA had failed, by virtue of an unreasonable delay, to act, as required by 29 U.S.C. § 655(b)(5), "to assure that no employee suffer material impairment of health[.]" In the Henshaw letter of December 16, 2003, which accompanied its brief to this Court, OSHA formally – and finally – denied UAW's 1993 petition requesting action. In the letter, OSHA gave two main reasons for deciding not to promulgate a rule for MWFs "now or in the foreseeable future." First, OSHA concluded, and we summarize broadly, that regulating MWFs was not appropriate because the science regarding MWF exposure neither adequately illuminated an effective way to determine an appropriate permissible exposure limit, nor supported the conclusion that MWF exposure causes cancer. Second, OSHA identified three agency priorities to regulate "toxic substances that pose more serious health risks than do MWFs," and asserted that agency resources could not accommodate the "enormous resource commitment" that a rulemaking on MWFs would require. OSHA found, however, that various non-regulatory measures will enable exposures to MWF hazards to be controlled effectively, and that those measures were in large part already underway.

## II. Discussion

In considering the petition for review, we (1) examine the relevant statutory framework, (2) assess whether OSHA had a statutory duty to regulate MWFs, and (3) evaluate whether OSHA's refusal to regulate MWFs was arbitrary and capricious.

### A. Statutory Background

There are two statutes relevant to our review: the Occupational Safety and Health Act and the Administrative Procedure Act.

### (1) The OSH Act

Congress enacted the OSH Act, "to

assure so far as possible every working man and woman in the Nation safe and healthful working conditions[.]" 29 U.S.C. § 651(b). "The Act authorizes the Secretary of Labor to establish, after notice and opportunity to comment, mandatory nationwide standards governing health and safety in the workplace." *American Textile Mfrs. Institute, Inc. v. Donovan*, 452 U.S. 490, 493 (1981) (citing 29 U.S.C. §§ 655(a), (b)). When the Secretary decides to promulgate a rule "dealing with toxic substances or harmful physical agents," the rule must "adequately assure[], to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity" even after a lifetime of exposure. 29 U.S.C. §§ 655(b)(5). The agency's priorities are judicially reviewable. *Public Citizen Health Research Group v. Chao*, 314 F.3d 143, 152 (3d Cir. 2002). A reviewing court is instructed, however, that "determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole." 29 U.S.C. § 655(f). And while the Secretary is accorded a broad measure of discretion in setting the agency agenda, the Secretary does not have absolute discretion. "In determining the priority for establishing standards . . . the Secretary shall give due regard to the urgency of the need for mandatory safety and health standards for particular industries, trades, crafts, occupations, businesses, workplaces or work environments." *Id*. at § 655(g). The Act also requires that the Secretary "give due regard to the recommendations

of the Secretary of Health, Education, and Welfare[.]" *Id*.

Finally, under the Act, the Secretary may appoint an advisory committee to assist in the development of a rule. 29 U.S.C. § 655(b)(1). "Where an advisory committee is appointed and the Secretary determines that a rule should be issued, he shall publish the proposed rule within sixty days after the submission of the advisory committee's recommendations[.]" *Id*. at § 655(b)(2).

### (2)    The APA

The Administrative Procedure Act directs an agency "to conclude [within a reasonable time] a matter presented to it." 5 U.S.C. § 555(b). It also empowers reviewing courts to compel agency action "unlawfully withheld or unreasonably delayed[.]" *Id*. at § 706(1). Reviewing courts are to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id*. at § 706(2); *Borough of Columbia v. Surface Transp. Bd.*, 342 F.3d 222, 229 (3d Cir. 2003).

### B.    Does OSHA Have a Duty to Regulate MWFs?

UAW contends that the "OSH Act demands either that the Secretary publish a proposed rule within 60 days after receiving an advisory committee recommendation that regulation is warranted or decide no rule should be

5

issued." Petitioners' Br. at 21 (citing 29 U.S.C. § 655(b)(2)). Because a majority of the MWFAC recommended promulgation of a rule in July 1999, certainly more than 60 days prior to the denial of rulemaking in December 2003, UAW urges us to require the Secretary to promulgate a rule to regulate MWFs. Whether and when there is a duty to act under the OSH Act is a question of law. Review is *de novo. Chao v. Rothermel*, 327 F.3d 223, 225 (3d Cir. 2003).

UAW points to 29 U.S.C. § 655(b)(2), which states that "[w]here an advisory committee is appointed and the Secretary determines that a rule should be issued, [s]he shall publish the proposed rule within sixty days after the submission of the advisory committee's recommendations[.]" 29 U.S.C. § 655(b)(2). UAW contends that the sixty day requirement is mandatory. We disagree.

First, the very language to which UAW points acknowledges the discretion of the Secretary to pursue regulatory action *if* she, in the exercise of that discretion, "determines that a rule should be issued." *Id*. There is nothing in the statute that requires the Secretary to cede discretionary authority to the advisory committee. The statute is silent as to the duties of the Secretary in the event, as here, that she determines a rule should not be promulgated, or if she is uncertain as to whether a rule should be promulgated. There is no reason to construe the statute to limit the Secretary's discretion in this area.

Second, the language and structure of § 655, taken as a whole, confirm, rather than restrict, the discretion of the Secretary to set the regulatory agenda under the OSH Act. *See id.* at § 655(g). The Secretary, by appointing an advisory committee, is not thereby stripped of discretion over whether or not to promulgate a rule or bound to the time constraints of § 655. The D.C. Circuit has addressed this issue on a number of occasions, and has each time convincingly confirmed that in § 655, the "statutory deadlines do not 'circumscribe the discretion of the' Administration; that its 'failure to act within their limits' is not, in itself, an abuse of discretion; and that the agency may rationally 'delay development of a standard at any stage as priorities demand.'" *Action on Smoking & Health v. Dep't of Labor*, 100 F.3d 991, 993 (D.C. Cir. 1996) (quoting *National Congress of Hispanic Am. Citizens v. Marshall*, 626 F.2d 882, 888 (D.C. Cir. 1979) and citing *National Congress of Hispanic Am. Citizens v. Usery*, 554 F.2d 1196, 1199-1200 (D.C. Cir. 1977) ("El Congreso"). *See El Congreso*, 554 F.2d at 1198-1200 (discussing § 655(b) and its legislative history and finding an "implicit acknowledgment that traditional agency discretion to alter priorities and defer action due to legitimate statutory considerations was preserved").

Finally, looking beyond the specific provision that UAW misreads as creating a duty to regulate to the larger mandate of the OSH Act itself, it is obvious that

OSHA cannot lightly be required to initiate a rulemaking: "There are likely thousands of substances that may pose a significant risk of harm to workers. OSHA could not possibly be required to undertake rulemaking on all of them simultaneously." Respondents' Br. at 36-37. *See also South Hills Health System v. Bowen*, 864 F.2d 1084, 1094 (3d Cir. 1988) ("Normally . . . an agency may exercise 'a generous measure of discretion respecting the launching of rulemaking proceedings.'") (quoting *Geller v. FCC*, 610 F.2d 973, 979 (D.C. Cir. 1979)).

Of course, once OSHA undertakes to promulgate a standard, it must reduce risk to the extent feasible, 29 U.S.C. § 655(b)(5), and its actions must be supported by substantial evidence. *Id.* at § 655(f). Here, however, OSHA never decided to regulate MWFs, much less formally initiated rulemaking proceedings with the publication of a proposed rule.

## C. Was OSHA's Action Arbitrary and Capricious?

We agree with the parties that OSHA's decision not to regulate MWFs should be upheld absent a determination that the decision was "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard applies to most agencies' decisions, including denials of petitions to institute rulemaking proceedings. *See, e.g., American Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d 1, 4 (D.C. Cir. 1987). Respondents also note, correctly in our view, that where agency action is challenged as unreasonably delayed or unlawfully withheld, agencies are scrutinized at the most deferential end of the arbitrary and capricious spectrum. *See, e.g., American Horse Protection Ass'n, Inc.*, 812 F.2d at 4-5 ("Review under the 'arbitrary and capricious' tag line . . . encompasses a range of levels of deference to the agency, . . . [and] an agency's refusal to institute rulemaking proceedings is at the high end of the range[.]") (citations omitted).

As we have recently noted, decisions "'that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake.'" *Public Citizen v. Chao*, 314 F.3d at 153 (quoting *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1154 (D.C. Cir. 1983)).[1]

---

[1]The "human lives . . . at stake" played a critical role in *Public Citizen*. A risk assessment of hexavalent chromium had concluded that exposure at the level then current over a 45 year working lifetime could be expected to result in between 88 and 342 excess cancer deaths per thousand workers. 314 F.3d at 147. In recognition of this "grave risk to public health," OSHA made hexavalent chromium a high priority and announced it was beginning a rulemaking. *Id.* at 145. More than nine years later, however, "nothing ha[d] happened" and OSHA admitted that it might not promulgate a rule for another

(continued...)

Nonetheless, an order directing the Secretary to institute rulemaking proceedings is appropriate only in rare and compelling circumstances. *American Horse Protection Ass'n, Inc.*, 812 F.2d at 7. This is not one of those circumstances.

The Henshaw letter of December 16 denying UAW's petition for a rulemaking sets out in detail the reasons why OSHA found it inappropriate to regulate MWFs. Importantly, OSHA weighed the scientific evidence of health hazards posed by exposure to MWFs against its other regulatory priorities. Obviously, OSHA has limited resources, and it named three priorities more pressing than MWFs: hexavalent chromium, crystalline silica, and beryllium. Each of these toxic substances had been identified by OSHA as connected by strong evidence to fatal and disabling diseases. In contrast, the

---

[1](...continued)
ten or twenty years, "if at all." *Id.* at 145, 154. Because of that extraordinary combination of circumstances, we were about to take the extraordinary step of compelling OSHA to act when OSHA finally instituted the long-promised rulemaking process. Separate and apart from other differences between that case and this, here OSHA, although in November 1999 having placed MWF's on its Regulatory Agenda under the heading "Long-Term Action," never found need for a rulemaking, much less announced an intention to commence a rulemaking proceeding.

evidence linking cancer to MWF exposure is equivocal. Even assuming that MWF exposure causes dermatitis, asthma, HP, and other respiratory diseases (which the scientific evidence supports), these diseases, as OSHA recognizes, are rarely fatal. This is not to say that the health effects of exposure to MWFs are insignificant, but only that OSHA justifiably prioritized the regulation of more severely toxic substances.

OSHA also identified the reasons why regulating MWFs will require an "enormous" allocation of resources. First, MWFs come in a variety of types, numerous combinations, and many forms. Exposure to one likely has different hazardous effects than to another. Sorting all of this out would require considerable effort and expense. Second, none of the scientific studies undertaken by the Committee quantitatively assesses the risks of MWFs. Thus, a significant amount of additional scientific work would have to be conducted. There is little doubt that a rulemaking proceeding that dealt comprehensively with MWFs would be, as the Henshaw letter explains, a lengthy and complex process.

UAW points to a number of studies, all showing the detrimental health effects of MWF exposure. No doubt, in a perfect world, no worker would suffer exposure to MWFs, and we are certainly sympathetic to the more than 1 million workers exposed to MWFs. So, too, in a perfect world, we would not have had the apparently unnecessary and surely

lamentable ten year delay between UAW's petition and OSHA's formal response. But in the real world, the Secretary has broad discretion to set the regulatory agenda of the agency, and the decision to direct OSHA's scant resources elsewhere was neither arbitrary nor capricious.

## III. CONCLUSION

"Distilled to its essence, [UAW's] petition . . . would have us intrude into the quintessential discretion of the Secretary of Labor to allocate OSHA's resources and set its priorities." *Oil, Chem., & Atomic Workers Union v. OSHA*, 145 F.3d 120, 123 (3d Cir. 1998). Certainly, at one time, OSHA made MWFs a regulatory priority. This fact alone, however, does not compel OSHA to promulgate a rule. To say that it does, as UAW would have us say, would be to also say that any time an agency explores a potential regulatory initiative, "once the inexorable process is begun, it must grind on and on to its statutory end even though the Secretary has long before decided to refuse to adopt it. This makes an absurdity of the Act and a fool out of Congress." *El Congreso*, 554 F.2d at 1199. This is a step we are not prepared to take. While the process here need not and should not have been "inexorable," much less as "inexorable" as it turned out to be, we trust that we will not again see delays such as were seen here. That having been said, it was not arbitrary and capricious for the Secretary to refrain from regulating MWFs. The petition for review will be denied.

Pollak, J., *concurring*:

I join the court's opinion. I would only add that what is at issue in this case is a change in regulatory policy coincident with a change in administration. Counsel for respondents said as much on oral argument: "The metalworking fluids . . . were listed as a high priority only following the priority-setting process of a prior administration . . . and those priorities are different than the current ones." There is nothing obscure, and nothing suspect, about this phenomenon. That's one of the important things that elections are about. Whether OSHA's current policy priorities are wiser or less wise than those previously pursued is not for a court to determine.[1] Our job is to

determine whether respondents' selection of new priorities should be deemed either "arbitrary" or "capricious." In making this determination with respect to agency declination to institute rulemaking, "as in more typical reviews . . . we must consider whether the agency's decision was 'reasoned.'" *American Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987); *cf. Public Citizen Health Research Group v. Chao*, 314 F.3d 143, 151 (3d Cir. 2002) ("Our polestar is reasonableness . . . ."). As the court's opinion persuasively establishes, OSHA's decision was clearly "reasoned" and hence not "arbitrary" or "capricious."

---

[1]

A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.

(continued...)

---

[1](...continued) *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part).