**RAYMOND PROFFITT FOUNDATION, et al., Plaintiffs,**

v.

**U.S. ARMY CORPS OF ENGINEERS, et al., Defendants.**

No. CIV. A. 99–4038.

United States District Court, E.D. Pennsylvania.

Aug. 22, 2000.

John W. Wilmer, Media, PA, for plaintiffs.

Silvia Sepulveda-Hambor, U.S. Dept. of Justice, Washington, DC, Richard A. Monikowski, K.T. Tomlinson, U.S. Atty. Office, Philadelphia, PA, defendants.

## MEMORANDUM & ORDER

ANITA B. BRODY, District Judge.

Before me is defendants' motion to dismiss Counts 1–8, 11 and 12. On July 11, 2000, I held oral argument on defendants' motion. The motion will be granted in part and denied in part.

## I. Introduction

Plaintiffs, the Raymond Proffitt Foundation and the Lehigh Stocking Association, a non-profit conservation group and a non-profit fishing association, respectively, bring this action against defendants, the U.S. Army Corps of Engineers and Lt. Col., Debra M. Lewis, District Commander for the Philadelphia District of the Corps ("Corps" or "Defendants") challenging the Corps' operation of two dams, the F.E. Walter Dam and Reservoir ("Walter Dam") and the Beltzville Dam. Plaintiffs allege violations of the Water Resources Development Act of 1986 ("WRDA"), as amended, 33 U.S.C. § 2201 et seq.; the

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.; the Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. §§ 661 et seq.; the Federal Water Pollution Control Act, ("Clean Water Act" or "CWA") as amended 33 U.S.C. § 1251 et seq.;[1] and the Pennsylvania Constitution, Art. 1, § 27. Plaintiffs assert jurisdiction under 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 et seq. Plaintiffs request declaratory and injunctive relief. Defendants have filed a motion to dismiss plaintiffs' claims arising under WRDA, NEPA, FWCA, and the Pennsylvania Constitution pursuant to Fed. R.Civ.P. 12(b)(6).

Plaintiffs seek a declaratory judgment that the Corps is: a) causing environmental harm to the Lehigh River and its wildlife; b) failing to fulfill its missions of environmental protection and recreation; c) in violation of major environmental laws; and d) violating its public duties by only fulfilling its environmental protection and recreation missions if paid to do so. Plaintiffs seek to enjoin defendants "from releasing water in a manner that violates defendants' mission of environmental protection" unless such release conflicts with the dam's flood control purpose and to mandate that the Corps develop a water release plan with the input of the U.S. Fish & Wildlife Service, the Pennsylvania Fish and Boat Commission and a coalition of private groups. Plaintiffs also seek to enjoin defendants from entering into any agreement with the Delaware River Basin Commission ("DRBC") unless the agreement provides for sufficient daily releases of water during the summer months.[2]

## II. Background

Except where noted, the following facts

---

1. Plaintiffs bring two counts, Counts 9 and 10, under the Clean Water Act. Defendants have not moved to dismiss these counts.

2. At oral argument, plaintiffs appear to have departed from their requests for such extensive relief. See Tr. at 42, 45.

are taken from the complaint.[3] I take the facts from plaintiffs' complaint as true and draw all inferences in the light most favorable to plaintiffs.

The Philadelphia District of the U.S. Army Corps is responsible for the operation of the Walter Dam and the Beltzville Dam,[4] the two dams at issue in this case. *See* WD Manual, Defs. Attachment D at 1–1. Both dams are part of the Lehigh River Basin Flood Control Project. *See id.* at 3–1.

The Walter Dam is located on the Lehigh River in Carbon, Monroe and Luzerne Counties in Northeastern Pennsylvania. The dam was completed in 1961. Construction of the Walter Dam was originally authorized for the primary purpose of flood control by Section 10 of the Flood Control Act of 1946. *See* Flood Control Act of 1946, ch. 596, § 10, 60 Stat. 641, 643. Years later, in the Water Resources Development Act of 1988, Congress designated the Walter Dam as a water resources project to be "operated in such a manner as will protect and enhance recreation." Pub.L. 100–676, 102 Stat. 4012. Two years after that, Congress passed the Water Resources Development Act of 1990, in which Congress included "environmental protection as one of the primary missions of the Corps ... in ... operating and maintaining water resources projects." 33 U.S.C. § 2316.

First, plaintiffs contend that the way that the Corps is releasing water from the Walter Dam into the Lehigh River does not protect the environment. According to plaintiffs, the Corps is releasing too little water during the summer, a period of low precipitation, and too much water during the spring and winter, periods of high precipitation. This is caused by the Corps' decision to set its "minimum release level," (the minimum amount of water released from the dam) at a flow rate that is too low. Plaintiffs assert that "this level is at drought conditions." *Id.* This low water flow in the Lehigh River has a negative impact on aquatic life as fish cannot survive during low flow periods. Plaintiffs claim that studies show increasing minimum release flows during the summer would protect downstream fish and wildlife. Increasing minimum release levels would also improve the water quality of the Lehigh River by diluting acid mine drainage and downstream sewage water. According to plaintiffs, the minimum release level set by the Corps also contributes to high volume water releases from the dam in the winter and spring months. These large releases adversely affect fish and wildlife in the area as extremely high flows destroy the eggs of aquatic animals and kill birds nesting downstream along the banks of the Lehigh River. Studies have found that rapid flow fluctuation harms the diversity and density of fish.

3. The factual background includes references to: 1) F.E. Walter Reservoir Water Control Manual (Revised 1994) ("WD Manual" or "Water Control Manual"); and 2) a 1975 Environmental Assessment ("EA") issued by the Corps regarding the Walter Dam. In evaluating a motion to dismiss, a court may "consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guaranty Corp. v. White Consolidated Indus. Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). These documents are public records and therefore, may be properly considered in deciding the defendants' motion to dismiss. The WD Manual, is considered an "administrative staff manual ... that affect[s] a member of the public" which the agency must make "available for public inspection and copying," 5 U.S.C. § 552(a)(2)(C), and for "examination by the public ... at the appropriate office of the Corps...." 33 C.F.R. § 222.5(g)(2)(ii). The EA is described as a "concise public document." 40 C.F.R. § 1508.9. Defendants request that I consider isolated facts found in the above documents, many of which were referred to by plaintiffs either in the complaint or during oral argument.

4. Plaintiffs bring one count regarding the Beltzville Dam, Count 5. As discussed later in this order, I will dismiss Count 5. Therefore, this section will refer only to the Walter Dam.

According to plaintiffs, the U.S. Fish & Wildlife Service actually told the Corps that the Corps' current minimum release policy "cause[s] harm to the Lehigh River." Pls.Resp. at 1. That agency as well as its state counterpart, the Pennsylvania Fish and Boat Commission, and environmental groups, including plaintiffs, have asked the Corps to provide a steady flow of water year-round to the Lehigh River to remedy some of their environmental concerns regarding the area surrounding the dam. They suggest that this be done by storing water in the spring and winter and releasing the stored water during the summer. Plaintiffs claim that the Corps told them that the Corps would only increase the water flow from the dam during the summer if a non-federal sponsor paid the Corps to store water during the spring and winter to provide a higher daily water flow in the summer.

Plaintiffs contend that the Corps has agreed, in the past, to increase release flows from the dam for the Delaware River Basin Commission, DRBC, by storing water in the dam's reservoir. If the Corps agreed to store water in the reservoir at the same elevation at which it has stored water for the DRBC, such storage would increase daily flows during the summer months. Plaintiffs point out that during a twenty-four hour period in July 1999, the water flow was 65 cubic feet per second ("cfs"). Storage at the level at which the Corps has agreed to store water for the DRBC would increase the minimum flow to 200 cfs for a three month period. According to plaintiffs, such a flow would protect "the environment of the Lehigh River."

Plaintiffs also assert that the way that the Corps is releasing water from the Walter Dam does not protect or enhance recreation in the area as low water flow in the Lehigh River adversely affects recreation on the river. Low flows during the summer months prevent members of plaintiffs' organizations from fishing, boating and whitewater rafting on the section of the Lehigh River downstream from the dam. One of the plaintiffs, the Lehigh Stocking Association stocks fish in the Lehigh River for recreational fishing. Low flows during the summer, allegedly kill many of these fish. These flows also have a negative impact on boating in the area and have caused the cancellation of several scheduled releases for whitewater rafting. Plaintiffs assert that increasing the water flow during the summer by storing water during the spring and winter would "protect and enhance" recreation.

Regarding plaintiffs' NEPA and FWCA claims, in 1975, the Corps issued an Environmental Assessment ("EA") for the Walter Dam indicating that the EA was "restricted to the effects of operation and maintenance as specified in the U.S. Army Corps of Engineers Operation and Maintenance Manual published in 1972 and the Reservoir Regulation Manual, revised September 1963." Defs. Attachment E at 12. At that time, a Finding of No Significant Impact ("FONSI") was made and therefore, an Environmental Impact Statement ("EIS") was not prepared. Defs. Attachment E at VI. When preparing the 1975 EA, the Corps consulted with the U.S. Fish & Wildlife Service and the Commonwealth's Department of Environmental Resources. Defs. Attachment E.

### III. Discussion

Defendants move to dismiss plaintiffs' claims for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). See Fed.R.Civ.P. 12(b)(6). In considering the motion, a court must accept as true all allegations in the complaint and all reasonable inferences that may be drawn therefrom, viewed in the light most favorable to the plaintiff. See *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997) (internal cita-

tions omitted). The claims may only be dismissed based on Rule 12(b)(6) if plaintiffs cannot demonstrate any set of facts that would entitle them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Jordan v. Fox, Rothschild, O'Brien, & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The burden is on the moving party to show that no claim has been stated. *See Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980).

## A. *Review under the APA*

Plaintiffs seek review of the Corps' action/inaction under the APA § 701– § 706, 5 U.S.C. § 701– § 706. Defendants agree that review under the APA is appropriate.[5] Section 702 of the APA provides for judicial review of agency actions or inactions: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.[6] The APA defines "agency action" to include the failure to act. 5 U.S.C. § 551(13).[7] Section 704 provides that a district court may review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court...." 5 U.S.C. § 704. Section 706 sets forth the standard of review applicable in APA cases. Section 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning

or applicability of the terms of an agency action. The reviewing court shall

> 1) compel agency action unlawfully withheld or unreasonably delayed; and

> 2) hold unlawful and set aside agency action, findings, and conclusions found to be

>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . . .

5 U.S.C. § 706(1), (2).

Under Section 706(1), the court's power is limited to compelling agency action unlawfully withheld or unreasonably delayed. Under 706(2), the court's power is limited to setting aside unlawful agency action and remanding to the agency for additional investigation and explanation. *See generally* 5 U.S.C. § 706; *NRDC v. Fox,* 93 F.Supp.2d 531, 536 (S.D.N.Y.2000).

Section 706(1) of the APA gives the court power to review agency inaction and, if unlawful, to compel action. *See* 5 U.S.C. § 706(1). Section 706(1) directs courts to compel agency action when agency inaction is contrary to a Congressional mandate. *See Oil, Chemical, & Atomic Workers Union v. Occupational Safety & Health Administration,* 145 F.3d 120, 124 (3d Cir.1998). The APA also permits court to "compel agency action when an agency's failure to act is found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ..." 5 U.S.C. § 706(1), (2)(A); *see Hondros v. United States Civil Service Comm'n,* 720 F.2d 278, 298 (3d Cir.1983) (stating that "[s]ection 706(1) authorizes

---

5. Defendants do not challenge reviewability of the WRDA's environmental protection provision or recreation provision under Section 701(a) which bars judicial review of agency action or inaction if "(1) statutes preclude judicial review; or (2) agency action is committed to agency action by law." 5 U.S.C. § 701(a). Additionally, defendants have not moved to dismiss on the basis that review is barred by § 704 that requires final agency action.

6. Neither party has raised the issue of standing. The allegations in plaintiffs' complaint appear to satisfy the standing requirements set forth in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *See also Society Hill Towers Owners' Assoc. v. Rendell,* 210 F.3d 168, 175–76 (3d Cir.2000).

7. " '[A]gency action' includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

this court to compel agency action arbitrarily or capriciously withheld").[8]

Under Section 706(2)(A), a reviewing court must "hold unlawful or set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An action will not be deemed arbitrary, capricious, or an abuse of discretion 'simply because one may happen to think it ill-considered or to represent the less appealing alternative solution available.'" *Hondros*, 720 F.2d at 295 (internal citations omitted). A "court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Society Hill Towers Owners' Assoc. v. Rendell*, 210 F.3d 168, 178 (3d Cir.2000) (internal citations omitted).[9]

## B. WRDA

Plaintiffs seek review under the APA § 706(1) and § 706(2) for defendants' alleged violations of the WRDA.

### 1. WRDA and its environmental protection mission

In Counts 1–4, plaintiffs claim that the Corps has violated the WRDA, 33 U.S.C.

§ 2316. The core of plaintiffs' complaint is found in Count 1. Plaintiffs maintain that the Corps is not complying with the WRDA of 1990, § 2316 by ignoring the Corps' statutorily mandated environmental protection mission and that this failure to act constitutes agency action "unlawfully withheld" under APA § 706(1). Alternatively, plaintiffs assert that the Corps has violated Section 2316, challenging the Corps' actions in operating the Walter Dam as arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

Defendants move to dismiss Count 1, asserting that the environmental protection mission set forth in the WRDA of 1990, § 2316, does not impose a specific duty on the Corps to store water during the winter and spring to provide a higher daily flow of water during the dry summer months. Defendants' sole basis for dismissal is that this is a general provision that does not require the Corps to establish a particular water release program.[10] Defendants have not responded to plaintiffs' claim that the Corps is totally ignoring its environmental protection mission. At oral argument, I requested that defendants address this claim, however, defendants failed to do so. Nor have defendants addressed plaintiffs' argument that the Corps' actions regarding its operation of the Walter Dam are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

8. Review of claims based on failure to act and on action taken are generally limited to the administrative record. However, in cases involving a claim that an agency unlawfully failed to act, "extra record evidence may be allowed ... if the record before the court is insufficient for the court to determine whether the agency unlawfully withheld compliance ... the [c]ourt might review the legislative history of the statutes in question, other indications of agency policy preferences, and past conduct of the agency." *Sierra Club v. United States Dept. of Energy*, 26 F.Supp.2d 1268, 1271 (D.Colo.1998).

9. My review of the Corps' action challenged under Section 706(2)(A) will be limited to the

administrative record before the Corps at the time it made its decision. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Society Hill Towers Owners' Assoc. v. Rendell*, 20 F.Supp.2d 855, 862 (E.D.Pa.1998); *Proffitt v. EPA*, 930 F.Supp. 1088, 1102 (E.D.Pa. 1996).

10. After reading plaintiffs' complaint and hearing oral argument, I determine that plaintiffs do not request an order that the Corps establish a particular water release program, instead plaintiffs seek an order that the Corps consider its environmental protection mission.

### a. Agency Action Unlawfully Withheld

In essence, plaintiffs claim that the WRDA of 1990, 33 U.S.C. § 2316 imposes a duty on the Corps to consider environmental protection as a primary mission in administering water resources projects and that the Corps has "unlawfully withheld" agency action by ignoring its environmental protection mission in operating and maintaining the Walter Dam.

The WRDA of 1990, in pertinent part, provides that:

(a) ... [t]he Secretary shall include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects.

(b) ... Nothing in this section affects—

(1) existing Corps of Engineers' authorities, including its authorities with respect to navigation and flood control....

33 U.S.C. § 2316.[11]

When interpreting a statute, a court must first look to the plain meaning of the statutory language at issue. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990); *Proffitt v. EPA*, 930 F.Supp. 1088, 1097 (E.D.Pa.1996). The language of the statute indicates that Congress intended for the Corps to consider environmental protection as a primary mission in its administration of water resources projects. *See e.g., United States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (discussing Congress' use of "shall" in a civil forfeiture statute and stating that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory"); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir.1999) (stating that the Supreme Court has made clear that the word "shall" imposes a mandatory duty); *Proffitt*, 930 F.Supp. at 1097 (citing cases).[12] Moreover, the Corps itself ac-

11. Regarding the limitations set forth in Section 2316(b)(1), the Corps does not appear to assert that water storage during the spring and winter to provide increased water flow during the summer would conflict with the dam's flood control purpose. Plaintiffs contend that the Corps can fulfill its environmental protection mission without jeopardizing its flood control purpose. In support of their assertion, plaintiffs note that the Corps has agreed to store water at higher elevation levels in the reservoir pool if paid to do so.

12. A review of the legislative history of the WRDA of 1990 also indicates that Congress intended the Corps to give consideration to environmental protection in operating and maintaining water resources projects. The environmental protection mission was originally introduced in H.R. 5370, the "Corps of Engineers Environmental Protection Act of 1990." *See* Benjamin H. Grumbles & Kenneth J. Kopocis, *Water Resources Acts: Developing an Environmental Corps*, 21 Envtl. L.Rep. 10308, n. 65 (June 1991). This bill was introduced by Congressman Stangeland of Minnesota and "reflects significant input from environmental organizations, particularly the National Wildlife Foundation." 136 Cong.Rec. E2490–01, 1990 WL 105231 (daily ed. July 25, 1990) (statement of Rep. Stangeland). H.R. 5370 was then incorporated into H.R. 5314, which after the conference report became the WRDA of 1990. During debate regarding H.R. 5314, Rep. Anderson stated that "H.R. 5314 ... includes several provisions to improve the quality of our environment ... For example, the bill provides that the Secretary is to include environmental protection as one of the primary missions of the Corps...." 136 Cong.Rec. H8107 (daily ed. September 26, 1990) (statement of Rep. Anderson). Anderson also explained that the bill provides for the "continuing expansion of the role of the [Corps] into the protection, preservation, and enhancement of our Nation's environmental resources." *Id.* at H8108. Similarly, Rep. Darden stated that "the bill ... places environmental protection at the forefront of Corps activities". *Id.* at H8113. At the debate regarding the conference report S. 2740, WRDA of 1990, Rep. Nowak, Chairman of the House Public Works and Transportation's Water Resources Subcommittee, stated that "I am particularly proud of the bill's provisions related to environmental enhancement ... the bill provides that the Secretary of the Army is to include environmental protection as one of the primary missions of the Corps." 136 Cong.Rec. H12329, H12334 (daily ed. Oct. 2, 1990)

knowledged at oral argument that Section 2316 requires the Corps to consider environmental protection as one of its missions in administering water resources projects. *See* Tr. at 49. The environmental protection mission requires that projects "be developed, implemented, and maintained with environmental protection principles as important as providing benefits for traditional uses, such as navigation and flood control." *See* Benjamin H. Grumbles & Kenneth J. Kopocis, *Water Resources Acts: Developing an Environmental Corps*, 21 Envtl.L.Rep. 10308 (June 1991).

Having determined that in the WRDA of 1990, Congress imposed a duty on the Corps to include environmental protection as one of its primary missions in operating and maintaining water resources projects, I must now consider plaintiffs' allegations that the Corps has failed to do so. Plaintiffs assert that Corps has not even attempted to fulfill its environmental protection mission and is "completely ignor[ing]" the statute. Pls. Surreply at 2 (unpaginated). In support of this assertion, plaintiffs note that although the Corps' WD Manual of 1994 refers to recreation and flood control as purposes for the Walter Dam, it does not even mention environmental protection. Several other Corps documents reviewed by plaintiffs do not refer to the environmental protection mission. Although the WD Manual does not mention environmental protection, it lists drought emergency water supply as one of the dam's purposes; plaintiffs assert that no authority establishes such a purpose for the dam. Moreover, plaintiffs point out that: 1) the Corps' current release policy causes harm to area fish and wildlife; 2) environmental groups and fish and wildlife agencies have challenged the minimum release levels as harmful to the Lehigh River and have asked the Corps to change the way it releases water from the dam; 3) the Corps has not evaluated the environmental impact of its release plan; and 4) the Corps has ignored studies that have found increased water flows during low flow periods "benefit the Lehigh River."

■ To the extent that plaintiffs are arguing that the Corps is violating Section 2316 of the WRDA of 1990 by ignoring its statutory obligation to include environmental protection as one its primary missions, the complaint states a cognizable claim that the Corps "unlawfully withheld" action under Section 706(1). Plaintiffs have made allegations which support a claim that the Corps is refusing to consider its environmental protection mission, contrary to Congress' statutory mandate. *See generally Carpet, Linoleum, and Resilient Tile Layers v. Brown*, 656 F.2d 564, 568 (10th Cir.1981) (stating that "[w]here an agency completely ignores the purpose of a controlling statute ... there cannot be any rational basis in law to support its decision") (internal citations omitted). Although Section 2316 may give the Corps discretion as to how it decides to carryout its mission, the statute does not permit the Corps to ignore its mission completely. *See e.g., Commonwealth of Pennsylvania v. National Ass'n of Flood Insurers*, 520 F.2d 11, 26 (3d Cir.1975), *overruled, in part, on other grounds, Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306, 317–318 (3d Cir.1981), (recognizing that although the statute at issue, which stated that the Commonwealth official "shall ... take action as may be necessary," gave the agency discretion regarding when and how to act, it "d[id] not permit disobedience to the initial directive, implicit in the statutory framework, requiring the Secretary to first consider whether or not action should be taken"); *Dabone v. Thornburgh*, 734 F.Supp. 195, 200 (E.D.Pa.1990) (citing *Flood Insurers* and stating that the statute required the agency to make a decision even if the substance of the decision was discretionary). Congress would not have enacted this provision if it did not intend for the Corps to give consideration to environmental protection in its operation and maintenance of water resources projects. Therefore, the Corps cannot abandon Congress' mandate that it include environmental protection as one of its primary mis-

(statement of Rep. Nowak). Rep. Hammerschmidt added that this bill "calls upon the Corps to give careful consideration to environmental protection in planning, designing, constructing, operating and maintaining of water projects." 136 Cong.Rec. H12329, H12333 (daily ed. Oct. 2, 1990) (statement of Rep. Hammerschmidt).

sions in administering water resources projects.[13]

### b. Agency Action Arbitrary, Capricious, An Abuse of Discretion or Otherwise Contrary to Law

Alternatively, plaintiffs assert that the Corps is violating Section 2316 of the WRDA of 1990, challenging the Corps' actions in operating the Walter Dam as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

■ Plaintiffs maintain that the Corps' release policy is arbitrary, capricious, an abuse of discretion, or not in accordance with law under Section 706(2)(A). At oral argument, plaintiffs asserted that the current release policy is polluting the Lehigh River in violation of the Clean Water Act. Construing the allegations set forth in plaintiffs' complaint broadly, plaintiffs may be challenging the Corps' decision to adopt its current release policy and/or to maintain such a policy, in light of evidence that its policy has a negative impact on fish and wildlife in the area. In support of their assertion that the Corps' decision to set and/or maintain its release policy violates Section 706(2)(A), plaintiffs contend that the Corps' current release policy is based, in part, on the fact that the dam's access road floods if water is stored in the reservoir at an elevation higher than 1300 feet. Plaintiffs allege that "there was no statutory authority to build the road" and the flooding of the road should not be considered by the Corps as a factor in setting its release policy.[14] At oral argument, the Corps suggested that it is satisfying its environmental protection mission by having a broad environmental program in place at the Walter Dam. *See* Tr. at 44–45. Plaintiffs' complaint states a cognizable claim that any efforts made by the Corps to implement environmental protection as one of its primary missions have been so inadequate as to violate the environmental protection mandate of Section 2316. Although under the arbitrary and capricious standard, I cannot substitute my judgment for that of the agency, I do have the power to determine whether, under the circumstances, the Corps' actions are arbitrary, capricious, or otherwise contrary to law under Section 706(2)(A).[15]

13. The APA also provides a means to challenge discretionary inaction by an agency if an agency arbitrarily and capriciously withholds action or if such inaction constitutes an abuse of discretion or is not in accordance with law under Section 706(2)(A). Based on the allegations above, plaintiffs have sufficiently alleged that the Corps has failed to make any attempt to incorporate environmental protection as one of its primary missions in administering the Walter Dam. Such inaction regarding the Corps' environmental protection mission may be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Plaintiffs' complaint may also be interpreted to claim that the Corps' failure to create a release policy that increases low flows during the summer is arbitrary capricious, an abuse of discretion or otherwise contrary to law, and constitutes unlawfully withheld agency action under Section 706(1). Assuming no conflict with the Corps' flood control purpose, in light of the numerous studies demonstrating the need to increase flows to protect fish and wildlife as well as requests by federal and state wildlife agencies for the Corps to increase release flows, the Corps' failure to increase flows may constitute agency action unlawfully withheld.

14. Additionally, the Corps' release policy and its adverse affect on the Lehigh River may be evidence to support plaintiffs' claim that the Corps is failing to include environmental protection as one of its missions in administering the dam. If the Corps' release policy is violating the CWA, this may serve as evidence that the Corps is ignoring its environmental protection mission. Moreover, the Corps' decision to keep in place a policy that violates the CWA may be evidence of the fact that the Corps is giving the mission so little consideration as to constitute action which is arbitrary, capricious, an abuse of discretion or otherwise unlawful under Section 706(2)(A).

15. I determine that Counts 2, 3, and 4 do not constitute separate causes of action. These counts include evidence that support plaintiffs' primary argument that the Corps is violating Section 2316 of the WRDA of 1990 by ignoring its environmental protection mission, or alternatively, by operating the dam in a way which is arbitrary, capricious, an abuse of discretion or otherwise unlawful. I will

### 2. WRDA and its recreation provision

Plaintiffs challenge the Corps' decision regarding how to operate the Walter Dam to satisfy the WRDA's recreation provision as arbitrary, capricious, an abuse of discretion, or otherwise unlawful under Section 706(2)(A).

Section 6 of the 1988 amendment to the WRDA, provides, in relevant part, that:

(a) [t]he Secretary shall ensure ... that each water resources project referred to in this subsection is operated in such manner as will protect and enhance recreation associated with such project ... [n]othing in this subsection shall be construed to affect the authority or discretion of the Secretary with respect to carrying out other authorized project purposes.... The provisions of this subsection apply to the following projects:

(4) Francis E. Walter Dam, Pennsylvania

(b) ... recreation includes (but shall not be limited to) downstream whitewater recreation which is dependant on project operations, recreational fishing, and boating on the water at the project.

Water Resources Development Act of 1988, Pub.L. 100–676, 102 Stat. 4012.

Plaintiffs claim that the Corps' efforts to protect and enhance recreation at the dam have been minimal. The Corps schedules the type of water releases required for white-water rafting five times annually during the summer and fall, however, these releases are frequently cancelled. Additionally, the Corps' current release policy fails to provide for fishing and boating. During oral argument, plaintiffs specifically challenged the Corps' decision regarding how to operate the dam to satisfy the WRDA's recreation provision. *See* Tr. at 11, 27. Based on documents obtained during plaintiffs' FOIA search, plaintiffs allege that the Corps' decision was based on inadequate information, and therefore, was arbitrary and capricious under Section 706(2)(A). *See* Tr. at 11–12, 27–28. Defendants move to dismiss only on the basis that the recreation provision does not impose a specific duty on the Corps to release water in a particular manner.

 At this stage in the litigation, to the extent that plaintiffs are challenging the Corps' decision regarding how to operate the Walter Dam "in such manner as to protect and enhance recreation," I will deny defendants' motion to dismiss Count 6. Plaintiffs may be able to establish a factual record that shows, under the circumstances, the Corps' decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under Section 706(2)(A).[16]

### C. NEPA

In Count 12, plaintiffs allege that the Corps has failed to comply with NEPA, 42 U.S.C. § 4321. The primary issue is

---

grant defendants' motion to dismiss these counts, without prejudice for plaintiffs to amend their complaint consistent with this memorandum.

16. In Count 5, plaintiffs allege that the Corps' releases of water from the Beltzville Dam for the DRBC violate the Corps' mission of recreation for the Beltzville Dam. At oral argument, plaintiffs acknowledged that in the WRDA of 1988, Congress did not designate the Beltzville Dam as one of the projects which the Corps must operate to protect and enhance recreation. *See* Tr. at 13. I requested that plaintiffs' counsel provide me with statutory authority for Count 5. On June 18, 2000, my chambers received a letter from plaintiffs' counsel stating that although the Corps' Water Control Manual for the Beltzville Dam refers to this mission and defendants admitted in their answer that recreation was one of the Corps' missions at the Beltzville Dam, counsel was unable to find a statutory reference to a recreation mission for Beltzville. "There is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the legal basis for [the] complaint.'" *Curry v. United States Forest Service,* 988 F.Supp. 541, 547 (W.D.Pa.1997) (internal citations omitted). On the basis of the information provided by plaintiffs, I determine that this is not a sufficient basis for review under the APA and therefore, I will dismiss Count 5.

whether the Corps' minimum release policy and the Corps' storage of water for the DRBC trigger NEPA.

Generally, when a federal agency proposes an action, NEPA requires a federal agency to first prepare an environmental assessment ("EA") to make a threshold determination whether to prepare an environmental impact statement ("EIS") or whether to issue a finding of no significant impact ("FONSI"). *See Society Hill Towers Owners' Assoc.,* 210 F.3d at 173–74. An EA is a "screening device." *Township of Lower Alloways Creek v. Public Service Elec. & Gas Co.,* 687 F.2d 732, 740 n. 17 (3d Cir.1982) (internal citations omitted). An EIS must be prepared if the EA finds that the proposed action is a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Alternatively, an agency may make a finding of no significant impact and therefore, an EIS is not required. The agency must then file a FONSI, a document which briefly provides the reasons, based on the EA, why an action will not significantly affect the quality of the human environment. *See* 40 C.F.R. § 1501.4(e); § 1508.13.

NEPA "is primarily a procedural statute ... designed to ensure that environmental concerns are integrated into the very process of agency decisionmaking." *Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 274 (3d Cir.1983) (internal citations omitted)

NEPA does not apply retroactively. *See Pennsylvania Environmental Council v. Bartlett,* 454 F.2d 613, 624 (3d Cir.1971). Federal actions that maintain the status quo do not trigger NEPA requirements. *See Fund for Animals, Inc. v. Thomas,* 127 F.3d 80, 84 (D.C.Cir.1997).

Indeed, routine maintenance of an ongoing, pre-NEPA project does not trigger NEPA's requirements. *See Upper Snake River of Trout Unlimited v. Hodel,* 921 F.2d 232, 234 (9th Cir.1990); *County of Trinity v. Andrus,* 438 F.Supp. 1368, 1389 (E.D.Cal.1977).[17] However, "the mere fact that the project was initiated prior to January 1, 1970, will not insulate all future action pursuant to that project from the requirements of NEPA." *Trinity,* 438 F.Supp. at 1388. The requirements of NEPA are triggered if, after NEPA's effective date, an agency takes major federal action regarding a fully operational pre-NEPA project. *See Port of Astoria v. Hodel,* 595 F.2d 467, 479 (9th Cir.1979). In other words, if a project undergoes changes that themselves constitute "major federal actions," the federal agency must comply with NEPA procedures. *See Andrus v. Sierra Club,* 442 U.S. 347, 363 n. 21, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979). Therefore, the preparation of an EIS may be required "when a project takes place in incremental stages of major proportions" or where "a revision or expansion of [a pre-NEPA project] is contemplated." *Upper Snake River,* 921 F.2d at 235 (quoting *Trinity,* 438 F.Supp. at 1388).[18] The determination of whether an agency action constitutes a major federal action "depend[s] heavily upon the unique factual circumstances of each case." *Westside Property Owners v. Schlesinger,* 597 F.2d 1214, 1224 (9th Cir.1979). In this context, courts have looked at "whether the proposed agency action and its environmental effects were within the contemplation of the original project when adopted or approved." *Westlands Water District v. United States,* 850 F.Supp. 1388, 1415 (E.D.Cal.1994) (listing cases).

---

**17.** Under 33 C.F.R. § 230.9, certain actions are "excluded from NEPA documentation," such as "[a]ctivities at completed Corps projects which carry out authorized project purposes. Examples include routine operation and maintenance actions, general administration, ...." 33 C.F.R. § 230.9(b)

**18.** Additionally, the Corps' regulations specify that "[p]roposed major changes in the operation and/or maintenance of completed projects" normally require an EIS. 33 C.F.R. § 230.6(c).

The parties agree that because the construction of the Walter Dam was completed and was in operation in 1961, nine years before NEPA became effective on January 1, 1970, NEPA does not apply to the construction of the Walter Dam. Plaintiffs contend that the Corps failed to comply with NEPA's procedural requirements before setting its current release policy and before storing water for the DRBC in August 1999. Plaintiffs also maintain that the proposed storage agreement between the Corps and the DRBC triggers NEPA's procedural requirements.

Defendants move to dismiss plaintiffs' NEPA claim. Defendants assert that Corps' decisions regarding the regulation of flow are determined by fact that the Corps must maintain a normal pool level of 1300 feet. Relying on *Trinity* and *Upper Snake River,* defendants move to dismiss plaintiffs' NEPA claim, asserting that the daily regulation of releases of water from the dam and the minor adjustments of flow necessary to meet fluctuating conditions do not trigger NEPA.[19]

■ First, plaintiffs appear to argue that the Corps' current release policy, as set forth in the WD Manual of 1994, was not contemplated at the Walter Dam's inception. Plaintiffs allege that the fact that the WD Manual was revised in 1994, for the first time since 1961, suggests that the type of operations now carried out at the dam were not considered when the dam began operations. Second, plaintiffs claim that storing water for the DRBC in August 1999 and the Corps' proposed agreement to store water for the DRBC trigger NEPA. According to plaintiffs, the Corps stored water during an August 1999 drought which required the Corps to re-duce the minimum release level to 50 cfs. The Corps agreed to maintain this low flow until the water level in the reservoir reached a particular elevation level. The Corps is planning to store over 27 billion gallons of water for the DRBC, an amount fifty to sixty times greater than the amount of water normally stored in the dam. *See* Tr. at 29–30. According to plaintiffs, storage for drought purposes is not an authorized purpose for the dam. Therefore, such storage may not have been contemplated when the dam began operations, and may not constitute routine managerial change. Although the analysis set forth in *Trinity* and *Upper Snake River* may ultimately apply to plaintiffs' NEPA claim, at this stage in the litigation, taking plaintiffs' allegations as true, I cannot say as a matter of law that the actions of the Corps set forth above do not trigger NEPA. Therefore, I will deny defendants' motion as to Count 12.

### D. FWCA

In Count 8, plaintiffs allege that the Corps is violating FWCA, 16 U.S.C. § 662(a), by failing to consult with fish and wildlife agencies regarding the impact of the Corps' current release policy and its water storage for the DRBC.[20] FWCA provides, in pertinent part:

> whenever the waters of any stream or other body of water ... to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States ... such department or agency first shall consult with the United States Fish and Wildlife Ser-

---

19. Although in defendants' motion to dismiss, defendants assert that plaintiffs state in their complaint that a normal pool elevation of 1300 feet had existed since 1961, my review of plaintiffs' complaint did not reveal such a statement. Furthermore, defendants asserted that plaintiffs' complaint at ¶ 23 stated that "[maintenance of the reservoir at a 1300 feet elevation requires the Corps to constantly monitor the flow of water into reservoir and to regulate the releases exiting the reservoir,]" plaintiffs' complaint at ¶ 23 states only "the Walter [D]am interrupts and controls the flow of the Lehigh River." Compl. at ¶ 23.

20. Plaintiffs have withdrawn Count 7, also a claim under FWCA. *See* Pls. Resp. to Defs. Motion at p. 20; Tr. at 287.

vice, Department of Interior, and with the head of the agency exercising administration over the wildlife resources of the particular state. . . .

16 U.S.C. § 662(a).

The statute also requires that the reports and recommendations issued by the Fish and Wildlife Service and the head of the state agency "shall be made an integral part of any report prepared and submitted by any agency of the Federal Government" which is required to consult with the Fish and Wildlife Service. 16 U.S.C. § 662(b). Additionally, the agency must give full consideration to its reports and recommendations. *See id.* The FWCA does not require that an agency adopt the view of the Fish and Wildlife Service and the state agency, rather it requires that these views "be given serious consideration." *See County of Bergen v. Dole,* 620 F.Supp. 1009, 1063 (D.N.J.1985) (internal citations omitted). FWCA applies to both "new project construction" as well as "modification or supplementation of plans for previously authorized projects." *Environmental Defense Fund, Inc. v. Andrus,* 596 F.2d 848, 853 (9th Cir.1979).

Plaintiffs maintain that although the Corps may have complied with FWCA in 1975, the Corps has not complied with the statute regarding the current release policy. Plaintiffs also assert that the Corps failed to consult with the appropriate agencies in August 1999 regarding the impact of the Corps' water storage for DRBC on wildlife resources. As part of that agreement, the Corps reduced the water flow from the dam to 50 cfs. At oral argument, plaintiffs stated that the Corps must consult with the appropriate agencies regarding the affect on the Lehigh River of its proposed agreement with DRBC to store 27 billion gallons of water. *See* Tr. at 30. According to plaintiffs, the plan would increase by fifty to sixty times the amount of water normally stored in the dam's reservoir. *See id.* Plaintiffs assert that the proposed storage of water for DRBC requires consultation under FWCA. The U.S.

Fish & Wildlife Service, however, told plaintiffs that it has never consulted with the Corps regarding water storage for drought purposes. *See id.*

Defendants move to dismiss Count 8, contending that the Corps complied with FWCA in 1975 when it consulted with the U.S. Fish & Wildlife Service and the corresponding state agency. Defendants contend that because the Corps has not commenced or modified the Walter Dam since the 1975 consultation, defendants assert that the Corps is not required to "reconsult" with those agencies. In support of their assertion that no "modification" of the Walter Dam has taken place since the initial consultation, defendants argue that the same analysis used to determine if the Corps' action is part of daily operations of an ongoing project under NEPA applies in evaluating whether a modification has taken place in the project to trigger FWCA.

■ Taking all plaintiffs' allegations as true, I cannot say, at this stage in the litigation, that plaintiffs have not stated a claim that the Corps failed to consult as required by FWCA. Therefore, I will deny defendants' motion to dismiss this count.

### E. Article I § 27 of the Pennsylvania Constitution

In Count 11, plaintiffs allege that the Corps' current release policy violates Art. I. § 27 of the Pennsylvania Constitution by releasing too much water in the spring and failing to store and release in a way that would provide for an increased daily flow during the summer. Art. I § 27, in pertinent part, states:

The people have a right to clean air, pure water, and to the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and

maintain them for the benefit of all people.

Art. I § 27.

Defendants move to strike this count, stating only that this claim arises under state law. Although other bases for dismissal of this count may exist, I will deny defendants' motion to dismiss Count 11 as defendants' sole basis for dismissal is that this is a state claim, ignoring the possibility that I may exercise supplemental jurisdiction under 28 U.S.C. § 1367.

**AND NOW,** this ___ day of August, 2000, for the foregoing reasons, it is **ORDERED** that:

1. Defendants' Partial Motion to Dismiss (Docket Entry No. 10) Count 1 is **DENIED;**

2. Defendants' Partial Motion to Dismiss (Docket Entry No. 10) Counts 2, 3, and 4 is **GRANTED** without prejudice for plaintiffs to amend consistent with this memorandum.

3. Defendants' Partial Motion to Dismiss (Docket Entry No. 10) Count 5 is **GRANTED;**

4. Defendants' Partial Motion to Dismiss (Docket Entry No. 10) Count 6 is **DENIED;**

5. Defendants' Partial Motion to Dismiss (Docket Entry No. 10) Count 12 is **DENIED;**

6. Defendants' Partial Motion to Dismiss (Docket Entry No. 10) Count 8 is **DENIED;**

7. Defendants' Partial Motion to Dismiss (Docket Entry No. 10) Count 11 is **DENIED;** and

8. Plaintiffs have withdrawn Count 7. Defendants' Partial Motion to Dismiss (Docket Entry No. 10) Count 7 is **DENIED** as moot.